2023R00131/DVC

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 23-181 (KMW) |
| | : | |
| v. | : | 18 U.S.C. § 1349 |
| | : | |
| MICHAEL LAMBE, | : | |
| a/k/a "Michael Carter," | : | |
| a/k/a "Michael Smith," | : | |
| a/k/a "Mike Murphy" | : | |

**I N F O R M A T I O N**

The defendant having waived in open court prosecution by Information, the United States Attorney for the District of New Jersey charges:

**COUNT ONE**
(Conspiracy to Commit Wire Fraud)

**Relevant Individuals and Entities**

1.  At all times relevant to this Information:

    a.  Co-Conspirator 1, a/k/a "Patrick Burns" ("CC1"), who is named as a co-conspirator but not as a defendant herein, resided in New Jersey and Florida. CC1 operated and controlled WILLIAMS ANDREWS BURNS LLC, a New Jersey company, RESORT BNB, INC., a Florida company, and WILLIAMS & BURNS, INC., a Florida company, and other entities (collectively referred to as "WAB"). WAB maintained its primary offices in New Jersey, and, at various times, also maintained offices in California, New York, and Arizona.

    b.  Co-conspirator 2 ("CC2"), who is named as a co-conspirator but not as a defendant herein, resided in New Jersey and Florida. CC2 was employed at WAB as the Controller/bookkeeper.

1

c. Co-conspirator 3 ("CC3"), a/k/a "Jason Turner," a/k/a "Jason Thomas," who is named as a co-conspirator but not as a defendant herein, resided in New Jersey. CC3 was employed by WAB as a salesperson and supervisor.

d. Co-conspirator 6 ("CC6"), who is named as a co-conspirator but not as a defendant herein, resided in California. CC6 was employed by WAB as a salesperson and the supervisor of WAB's California office during the period from in or about April 2017 through in or about May 2019.

e. Co-conspirator 7 ("CC7"), a/k/a "Cathy Price," who is named as a co-conspirator but not as a defendant herein, resided in New Jersey. CC7 was employed at WAB as a salesperson.

f. Alex Klemash, a/k/a "Alex Gaskarth," who is named as a co-conspirator and charged elsewhere, resided in New Jersey, and was employed by WAB as a salesperson and supervisor.

g. Defendant MICHAEL LAMBE, a/k/a "Michael Carter," a/k/a "Michael Smith," a/k/a "Mike Murphy," resided in New Jersey. Defendant MICHAEL LAMBE was employed by WAB as a salesperson and supervisor during the period from in or about December 2018 through in or about January 2020.

h. WAB maintained the following bank accounts at the following banks, in the names of the following corporate entities during the periods indicated below, each of which had

the following authorized signatories:

| Bank | Account Title/Time Period | Last Four Digits of Account Number | Authorized Signatory(ies) |
|---|---|---|---|
| Santander Bank | Williams Andrews Burns LLC (October 2016 – April 2018) | 1115 | CC1 and CC1's relative |
| Santander Bank | Williams Andrews Burns LLC (February 2017 – June 2018) | 4771 | CC1 and CC1's relative |
| Parke Bank | Williams Andrews Burns LLC (June 2017 – May 2018) | 6134 | CC1 and CC1's relative |
| Parke Bank | Williams Andrews Burns LLC (October 2016 – April 2018) | 6538 | CC1 and CC1's relative |
| Republic Bank | Williams Andrews Burns LLC (May 2018 – June 2018) | 8832 | CC1 and CC1's relative |
| Wells Fargo Bank | Williams Andrews Burns LLC (April 2018 – July 2018) | 3361 | CC1 and CC1's relative |
| Wells Fargo Bank | Williams Andrews Burns LLC (May 2018 – July 2018) | 4354 | CC1 |
| TD Bank | Williams Andrews Burns LLC (June 2018 – February 2020) | 2043 | CC1 and CC1's relative |
| TD Bank | Resort BNB Inc. (November 2019 – June 2020) | 4401 | CC1 |
| TD Bank | Williams & Burns, Inc. (December 2018 – June 2020) | 1204 | CC1 |
| Citizens Bank | Resort BNB Inc. (December 2019 – January 2020) | 8056 | CC1 |
| Citizens Bank | Williams Andrews Burns LLC (June 2018 – January 2020) | 4568 | CC1 |
| BB&T Bank | Williams Andrews Burns LLC (January 2020 – April 2020) | 9469 | CC1 |
| City National Bank of Florida | Resort BNB Inc. (January 2020 – December 2020) | 1185 | CC1 |
| City National Bank of Florida | Williams & Burns Inc. (January 2020 – November 2021) | 1158 | CC1 |
| Iberia Bank | Williams & Burns Inc. (February 2020 – December 2020) | 6503 | CC1 |
| Iberia Bank | Resort BNB Inc. Operating Account (February 2020 – October 2020) | 6538 | CC1 |
| Iberia Bank | Williams Andrews Burns LLC Operating Account (February 2020 – January 2021) | 6554 | CC1 |

  i.  The above listed banks were "financial institutions" within the meaning of Title 18, United States Code, Section 20.

## The Conspiracy

2. From as early as December 2018 through in or about January 2020, in Gloucester and Camden Counties, in the District of New Jersey and elsewhere, the defendant,

> MICHAEL LAMBE, a/k/a "Michael Carter,"
> a/k/a "Michael Smith," a/k/a "Mike Murphy,"

did knowingly and intentionally conspire and agree with others to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice is set forth below, and for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

## Object of the Conspiracy

3. The object of the conspiracy was for defendant MICHAEL LAMBE and his co-conspirators (hereinafter collectively referred to as "the Conspirators"), to financially enrich themselves by selling fraudulent services to timeshare owners offered through WAB, including offering to rent and/or buy the owners' timeshares under false and fraudulent pretenses or representations, and offering to recover monies timeshare owners had previously paid in connection with other scams.

## Manner and Means of the Conspiracy

4. It was part of the conspiracy that:

  a. Through WAB, CC1 operated and controlled tele-marketing calling centers in Gloucester and Camden Counties, New Jersey and elsewhere, which employed defendant

4

MICHAEL LAMBE and numerous other individuals and co-conspirators. CC1 employed supervisors, including defendant MICHAEL LAMBE, who were part of the sales team, and who assisted CC1 in running the offices and managing WAB's employees. WAB employees were primarily paid by commission, and generally performed specific roles defined by job title. For example, the sales personnel who contacted the timeshare owners and sold the services to them were referred to as "Fronters" and "Closers" (collectively referred to herein as the "Sales Conspirators"). The personnel who worked to collect monies on behalf of the timeshare owners were referred to as "Collectors."

        b.      CC1 obtained lists of timeshare owners and their contact information, known as "lead sheets," which he provided to defendant MICHAEL LAMBE, Alex Klemash and the other Sales Conspirators. CC1 obtained some of these lead sheets from CC3 and CC6.

        c.      Using these lead sheets, defendant MICHAEL LAMBE, Alex Klemash and other Conspirators called timeshare owners, many of whom were senior citizens, and offered services in return for fees. Those services included renting and/or buying the timeshare owners' timeshares. The Conspirators also offered to recover monies timeshare owners had previously paid in connection with other scams.

        d.      In offering such services and collecting fees from timeshare owners, the Conspirators made numerous false, fraudulent, and misleading statements, representations and promises to the timeshare owners through a variety of sales pitches, some of which were memorialized in written "scripts" provided by CC1. CC3 assisted CC1 in drafting some scripts. The Conspirators were encouraged to make further false statements, representations and promises and use whatever sales tactics necessary to sell the services or combination of services, and to obtain money from the timeshare owners.

        e.      WAB employed "Collectors" who were responsible to call new customers and offer "collection services," that was, to collect or recover money for timeshare owners who lost money in previous scams. Although CC1 was not a collector, he was occasionally involved in

the collection process and the training of new Collectors.

## RENTAL SERVICES

  f.  Defendant MICHAEL LAMBE, CC1, CC3, CC6, CC7, Alex Klemash, and others were Sales Conspirators who initiated contact with timeshare owners by cold calling them and offering to rent their timeshares for an upfront fee. While pitching the rental services to the timeshare owners, the Sales Conspirators made the following false, fraudulent, and misleading statements, among others:

    i.  The timeshare owner had three "bonus" or "getaway" weeks which were not part of their ordinary deeded timeshare time.

    ii.  The "bonus" or "getaway" weeks were going to expire shortly, if they were not used.

    iii.  There was an event (*e.g.*, a flower show, a convention, a concert, or a sporting event) in the area of the timeshare owner's timeshare unit which caused a demand for rentals in that geographical area.

    iv.  If the timeshare owner was not planning on using these bonus weeks, WAB could rent these weeks out on behalf of the timeshare owner, generally, at a rate of $2,100/week, for a total rental income of $6,300/year.

    v.  In return for this rental income, the timeshare owner was required to pay an upfront fee, typically, $1,899 for an "annual membership," or $2,899 for a "lifetime membership," which generally entitled the timeshare owner to one year or life (sometimes defined as five years) of rental income, respectively. If the timeshare owner did not have sufficient money to pay the entire fee upfront, the Sales Conspirators often permitted the timeshare owner to pay in installments or agreed to a reduced fee.

    vi.  Offered a money-back guarantee, guaranteeing that the timeshare owners would receive their upfront fee monies back if they did not receive the promised rental monies within a specific period of time, usually 180 days from the owners' payment date.

  g. In actuality, however, the entire rental services offered by defendant MICHAEL LAMBE, CC1, CC3, CC6, CC7, Alex Klemash and others were based upon false and fraudulent representations and promises, and was frequently used by WAB employees as a "bait and switch" in an effort to obtain customers for their "collections services." WAB's rental services offer generally included the following false and fraudulent misrepresentations and promises, among others:

  i. The timeshare owner had "bonus" or "getaway" timeshare weeks apart from their normal allotted time. In actuality, the timeshare owner did not have any such "bonus" or "getaway" timeshare weeks.

  ii. The "bonus" or "getaway" weeks would expire soon. This statement was intended to create a false sense of urgency by pressuring the timeshare owner to pay their upfront fees quickly lest they miss out on the promised rental income even though the non-existent "bonus" weeks did not have an expiration date.

  iii. There was an event scheduled to occur in the geographical area of the timeshare owner's unit which increased the demand for such rentals. In actuality, these statements were also part of the high-pressure sales tactics used by WAB's Sales Conspirators.

  iv. WAB rented out timeshares on behalf of timeshare owners. In actuality, WAB did not rent or arrange for the rental of any of the owner's timeshare.

  v. The timeshare owner would receive rental income, generally estimated at $6,300/year, for either one year or for life (sometimes defined as five years) depending on whether the owner had enrolled in the one year or lifetime membership. In actuality, WAB never paid any timeshare owner the promised rental income.

  vi. The timeshare owner would receive a full refund of their upfront fees if their timeshare unit was not rented within the specified time period. Most of the timeshare owners who requested a refund from WAB never received any money back.

## PAYMENTS/VERIFICATIONS

h.   When a timeshare owner agreed to purchase the rental services, the Sales Conspirator collected payment information, which included the timeshare owner's bank account and routing numbers, and wrote them on a "Payment Sheet." The Sales Conspirator typically forwarded the Payment Sheet to a supervisor, that is, defendant MICHAEL LAMBE, CC1, CC3, Alex Klemash, and/or CC6, or WAB's controller, CC2.

i.   CC2 used that information on the Payment Sheet to prepare and print checks, drawn on the timeshare owners' bank accounts, which were made out to WAB for the amount of the sale. These checks were generally deposited in person by CC1 and/or CC2 into one of WAB's bank accounts.

j.   Generally, when a check was received at one of WAB's banks, the bank scanned the check and sent it electronically to a clearing house for processing. A small number of timeshare owners paid by other means, including by mailing checks to WAB's offices in New Jersey, bank wire transfers, credit card payments, and money remitting services.

k.   After obtaining the payment information, generally, CC1 required the Sales Conspirators to obtain verification of the timeshare owner's agreement to the sale. This was accomplished in two ways:

   i.   The first way involved a transfer by the Sales Conspirator of the timeshare owner's call to a supervisor, that is, defendant MICHAEL LAMBE, CC1, CC3, or Alex Klemash. In a recorded call, the supervisor spoke to the timeshare owner and verified the timeshare owner's name, address, and payment amount, and obtained verbal consent to withdraw the fee from the owner's bank account. This was called a voice verification. During those conversations, the supervisors would often add—even if not previously discussed with or agreed to by the timeshare owners—a statement that the fees were being paid for both rental and collections services.

   ii.   The second way of verifying the transaction was accomplished by having

the timeshare owner electronically sign a confirmation letter authorizing WAB to withdraw funds from the timeshare owner's bank account. In addition, CC1 or CC2 often sent an email to the timeshare owner post-sale, which included—sometimes for the first time—a statement describing the collections services offered by WAB, and which tied the money back guarantee to both rental and collections services. All of this was done in an attempt to legitimize the transactions, including by: (i) legitimizing the self-printed checks as a means of payment, which were sometimes questioned and/or flagged by the banks; (ii) conflating the collections services with the bogus rental services; and (iii) tying the collections services to the money back guarantee, which the Conspirators later relied upon to justify their failure to provide refunds.

### EMPLOYEES WERE PAID PRIMARILY BY COMMISSION

l.   WAB employees tracked the fees paid by the timeshare owners on white boards posted in WAB's offices, typically on a weekly basis. The Conspirators were paid by commission on a tiered sliding scale—with the percentage of the commission increasing in correspondence to the Conspirator's sales—as an incentive to sell more. At various times, CC1 or CC2 caused payments to be made to the Conspirators representing the Conspirator's share of the proceeds of each sale.

### COLLECTIONS SERVICES

m.   The Conspirators who worked as "Collectors," called new customers and offered "collections services," that was, to collect or recover money for timeshare owners who allegedly lost money in previous scams. Most often, these collections services were initially offered as a free service to timeshare owners who had paid for rental services.

n.   Generally, Collectors worked with the timeshare owners to obtain the timeshare owners' credit card records, review the records for any potentially fraudulent charges—particularly from companies known to have committed timeshare fraud—set up a conference call with the timeshare owner and the credit card company's representative, and then dispute various charges with the credit card company. In many instances, the Collectors obtained, and

attempted to obtain, refunds from credit card companies under false and fraudulent pretenses, representation, and promises. The Collectors also directed timeshare owners to make false and fraudulent statements to the credit card companies. Those false and fraudulent statements by the timeshare owners often included:

      i.      Falsely stating that the Collector was a friend or relative of the timeshare owner so that the Collector would be permitted by the credit card company to speak on behalf of the owner; and/or

      ii.      Falsely claiming that the disputed charge had never been authorized by the timeshare owner.

o.      If a Collector was able to obtain a refund of a credit card charge on behalf of a timeshare owner, the credit card company typically credited the timeshare owner's account with a temporary credit. The Collector would then provide notification about the refund to CC1, CC2, or CC3, and the Sales Conspirator who originally contacted the timeshare owner. The Sales Conspirator would then call the timeshare owner, and ask the timeshare owner to pay another fee for the collections services, typically, 50% or a lesser percentage of the amount "collected." If the original Sales Conspirator was unavailable, CC1, CC2 and/or CC3 would ensure that another WAB Sales Conspirator called the timeshare owner to attempt to collect the fee for the collections services. Anytime an additional fee was paid by a timeshare owner, the Conspirators referred to that as a "retread."

p.      When the Sales Conspirator obtained additional fees from the timeshare owners based upon collections, the fees would be logged on a white board in WAB's offices. The Sales Conspirators and Collectors were paid commissions based upon those fees.

q.      When the timeshare owners received a temporary refund on their credit cards, the Sales Conspirators sometimes pitched other schemes to the timeshare owners, claiming that additional monies could be collected in return for upfront fee payments.

r.      In some instances, the credit card refunds remained on the timeshare owner

account. In other instances, however, the credit card companies initially refunded the credit charge, only to reinstate it after an investigation. When the credit card companies reinstated the charges on the timeshare owners' credit account, WAB neither provided nor offered a refund for the fee collected. Therefore, the timeshare owner incurred an additional loss.

## GOVERNMENT AGENCY PITCH

s.  The Conspirators also offered additional fraudulent collections services through what was known as the "Attorney General pitch," the "AG pitch," or the "FTC [Federal Trade Commission] pitch," (collectively referred to herein as the "AG pitch"). In the AG pitch, a Sales Conspirator would call a timeshare owner, most often an existing client, and make the following false and fraudulent statements, misrepresentations or promises:

　　i.  The timeshare owner was owed thousands of dollars from a Government entity (often referring to the FTC or a state's Attorney General's Office), in the form of restitution for being a victim of timeshare fraud. When possible, the restitution fund was linked to a company with which the timeshare owner had done business in the past.

　　ii.  WAB would "release" the restitution funds to the timeshare owner in return for the payment of an upfront fee.

t.  In actuality, the entire AG pitch was fraudulent. WAB did not: work with any Government entities to provide restitution to timeshare fraud victims; have access to any known restitution funds; or make any payments to timeshare owners pursuant to this pitch.

## TIMESHARE TAKEOVERS/BUY OUTS

u.  The Sales Conspirators occasionally offered some timeshare owners an opportunity to sell or transfer their timeshares out of their names in return for a fee. This was appealing to some timeshare owners, mostly elderly owners, based upon their decreased ability to travel, ever-increasing fees charged by the timeshare companies, and/or the timeshare owners' fixed incomes. In all but one known case, the timeshares were not transferred or sold, and the timeshare owners lost their payment to WAB and also continued to incur timeshare fees.

COMPLAINTS/REFUND REQUESTS

v. Numerous timeshare owners who had paid fees to WAB complained to the Conspirators that they had not received the promised rental or collections monies, and requested refunds of upfront fees that they paid. Instead of standing behind the promised "money back guarantee," the Conspirators generally did not comply with the requests for refunds, and instead put off the timeshare owners by various tactics, including:

    i. Asking for more time to comply;

    ii. Providing false assurances that their monies would be forthcoming;

    iii. Avoiding their telephone calls;

    iv. Lying about not receiving their messages;

    v. Lying about having returned their calls;

    vi. Attempting to shift responsibility to the "other" WAB group (sales or collections); and

    vii. Failing to respond to any communications.

w. When the timeshare owners were able to reach the Conspirators on the telephone, the Conspirators gave various excuses for their failure to comply with their promises, including the cancellations of events or bad weather in the area of the timeshare owner's timeshare which prevented rentals, and blaming the failure of the timeshare owners to fully cooperate with their collections—including refusing to make false statements and lie to the credit card companies. In most instances, the Conspirators did not refund the timeshare owners' monies.

**Furthering the Conspiracy**

5. In furtherance of the conspiracy and to effect its objects, defendant MICHAEL LAMBE and his co-conspirators, both known and unknown, committed, and caused to be committed, the following acts, among others, in the District of New Jersey and elsewhere:

## VICTIM 2

6.     On or about August 28, 2018, CC7, while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 2, a timeshare owner from Texas. During the call, CC7, using the rental pitch, sold Victim 2 WAB's phony rental services for $949. CC7 took Victim 2's banking information, and caused a $949 check drawn on Victim 2's bank account to be prepared on or about August 28, 2018. The check was deposited at a Bank 5 branch in Miami, Florida, and was posted on August 29, 2018 to WAB's account at Bank 5 x2043.

7.     Thereafter, Victim 2 received an email confirmation, which stated: "If we do not collect or rent in 180 days you are entitled to a full refund. Please reply back to this email that you authorize this transaction."

8.     On or about April 1, 2019, defendant MICHAEL LAMBE, while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 2 and convinced Victim 2 to pay $1,731 for collections services. Defendant LAMBE took Victim 2's banking information and caused a $1,731 check drawn on Victim 2's bank account to be prepared on or about April 1, 2019. The check was deposited at a Bank 5 branch in Miami Beach, Florida, and, on or about April 2, 2019, was posted to WAB's account at Bank 5 x2043.

9.     Victim 2 never received any monies for the promised rentals or collections. Thereafter, Victim 2 repeatedly contacted WAB and asked for a refund, but eventually gave up when the Conspirators stopped responding to Victim 2's telephone calls. Victim 2 lost approximately $2,680.

## VICTIM 4

10.    On or about November 12, 2019, defendant MICHAEL LAMBE, while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 4, a timeshare owner from

Virginia. During the call, defendant LAMBE sold Victim 4 a conflated mixture of WAB's phony timeshare takeover and rental services for $749.

11. Defendant MICHAEL LAMBE took Victim 4's banking information, and caused a $749 check drawn on Victim 4's bank account to be prepared on or about November 12, 2019. The check was deposited at a Bank 5 branch in Washington Township, New Jersey. On or about November 13, 2019, the check was posted to WAB's account at Bank 5 x2043.

12. On or about January 30, 2020, CC1 contacted Victim 4 and caused Victim 4 to pay $500 for WAB's services. CC1 caused a wire to be sent from Victim 4's bank account to WAB's bank account at Bank 8 x1185 on that same date.

13. In or about February or March 2020, a Collections Conspirator communicated with Victim 4 multiple times and attempted to reverse multiple charges on Victim 4's credit card totaling approximately $15,000 from a prior fraud upon Victim 4. Victim 4's credit card company gave Victim 4 a temporary credit for approximately $15,000.

14. On or about March 12, 2020, CC7, while working in New Jersey, spoke via telephone with Victim 4. During the call, CC7 convinced Victim 4 to pay for WAB's collection services. Thereafter, CC7 caused a check to be prepared on or about March 13, 2020 on Victim 4's bank account for the amount of $2,500.

15. The $2,500 check was deposited at a Bank 8 branch in Miami Beach, Florida. On or about March 16, 2020, the check from Victim 4's account was posted to WAB's account at Bank 8 x1185.

16. After the $2,500 was debited from Victim 4's bank account, Victim 4 received an affidavit from his credit card company requiring him to affirm under penalty of perjury that he did not authorize the $15,000 in charges. Because Victim 4 had, in fact, authorized the charges,

he refused to sign the false affidavit. As a result, Victim 4's credit card company reinstated the $15,000 in charges. Victim 4 notified WAB about the reinstatement and, instead of being refunded the $2,500 fee, CC1 berated Victim 4 for failing to lie to the credit card company.

17. On or about September 8, 2020, a Sales Conspirator spoke via telephone with Victim 4 and convinced Victim 4 to pay $8,999 pursuant to the AG Pitch. During that call, the Sales Conspirator took Victim 4's credit card information, and caused Victim 4 to be charged $8,999 by two transactions of $4,499.50 on Victim 4's credit card.

18. At various times, Victim 4 requested a full refund of all the monies that he had paid to WAB, but has not received any of his monies back. Victim 4 lost approximately $12,748.

## VICTIM 8

19. On or about September 12, 2019, defendant MICHAEL LAMBE, while working at one of WAB's offices in New Jersey, spoke via telephone with Victim 8, a timeshare owner from New York. During the call, defendant LAMBE, using the rentals pitch, sold Victim 8 WAB's lifetime phony rental services for $2,449. Defendant LAMBE took Victim 8's banking information and caused a check to be prepared on or about September 12, 2019 drawn on Victim 8's bank account for the amount of $2,449. The $2,449 check was deposited at a Bank 5 location in Sewell, New Jersey. The check was posted on or about September 13, 2019 to WAB's account at Bank 5 x2043.

20. Victim 8 never received any monies for the promised rentals. Victim 8 repeatedly asked for a refund both by phone and email, but eventually gave up when one of the Conspirators falsely told Victim 8 that WAB was dissolved as of March 2020 due to the COVID-19 pandemic. Victim 8 lost $2,449.

THE FRAUDULENT SCHEME WAS COMMITTED THROUGH THE USE OF WIRES

21.  As listed in the table below, in the District of New Jersey and elsewhere, defendant MICHAEL LAMBE did knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce certain writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme, including telephone calls from defendant LAMBE at WAB's offices in New Jersey to Victims located outside of New Jersey, and the resulting transfers of the below listed monies in interstate and foreign commerce from the Victim's bank accounts into WAB's account at Bank 5 x2043:

| Telephone Call Date | Check Amount | Checks Posted Date | WAB's Bank Account | Timeshare Owner/Victim |
|---|---|---|---|---|
| 4/1/2019 | $1,731 | 4/2/2019 | Bank 5 x2043 | Victim 2 |
| 11/12/2019 | $749 | 11/13/2019 | Bank 8 x1185 | Victim 4 |
| 9/12/2019 | $2,449 | 9/13/2019 | Bank 5 x2043 | Victim 8 |

All in violation of Title 18, United States Code, Section 1349.

*Philip R. Sellinger by AZ*

_____
PHILIP R. SELLINGER
United States Attorney

CASE NUMBER: 23-_____

**United States District Court
District of New Jersey**

**UNITED STATES OF AMERICA**

**v.**

**MICHAEL LAMBE, a/k/a "Michael Carter,"
a/k/a "Michael Smith," a/k/a "Mike Murphy"**

**INFORMATION FOR**

**18 U.S.C. § 1349**

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

DIANA VONDRA CARRIG
ELISA T. WIYGUL
ASSISTANT U.S. ATTORNEYS
CAMDEN, NEW JERSEY
(856) 757-5026